Sharon DENNIS *v.* James DENNIS, II

CA 99–626                                             13 S.W.3d 909

Court of Appeals of Arkansas
Divisions I and IV
Opinion delivered April 5, 2000

*Mark S. Carter, P.A.*, by: *Mark S. Carter*, for appellant.

*R. Ted Vandagriff*, for appellee.

ANDREE LAYTON ROAF, Judge. The sole issue in this divorce case involves the unequal division of proceeds from the sale of the parties' jointly owned marital homestead. Sharon Dennis appeals from the chancellor's decision, which was based upon appellee James Dennis's claim of an oral agreement, to award James the nonmarital funds he contributed toward the purchase of the home. She contends on appeal that the chancellor erred by 1) awarding James a greater interest in homestead property held in tenancy by the entirety, or, in the alternative 2) awarding James a greater interest in marital property without stating the reasons for the unequal division, as required by statute. We affirm the chancellor.

Sharon and James were married in 1986. At the time of the marriage, they both owned homes in Little Rock. After the marriage, Sharon moved into the home owned by James; her home was subsequently sold. Sharon testified that she netted approximately $4,000 from the sale, and that those proceeds were used to pay marital expenses.

In 1990, the parties purchased a home in Cabot, Arkansas. Prior to this purchase, James also sold his home in Little Rock and netted approximately $31,000 as his share of the proceeds. James testified that this money was used for the down payment, closing costs, and moving expenses associated with the purchase of the home in Cabot. According to the testimony, the home in Cabot was titled in the names of "James A. Dennis and Sharon D. Dennis." After the purchase of the home in Cabot, James and Sharon, pursuant to agreement, each paid one-half of the monthly mortgage payments until they separated in June 1996. After the separation, Sharon remained in the home and made the entire payment during the pendency of the divorce.

At the final divorce hearing on November 25, 1998, Sharon testified first. Her testimony was that the parties had agreed to each pay one-half of the monthly mortgage payments, that she lived up to that agreement, and that they owned the house jointly, in "equal names." The only testimony offered by Sharon with regard to the agreement between the parties is as follows:

Q. Would you explain to the Court the arrangements which your husband had *in regard to the payments that were made, the monthly mortgage payments*?

A. The agreement that we had when we purchased the home in 1990 was that my contribution to the house would be half the house payment, and from that point in time, I began making half the house payment.

Q. You owned the house jointly?

A. Owned it jointly.

Q. Equal names?

A. Equal names.

Q. And you each made equal payments?

A. Yes, sir.

James testified after Sharon and concurred that the parties had agreed to divide the mortgage payments, however he testified that they also agreed that if they divorced he would get the $31,000 back out of the sale of the house, and the rest would be divided between the parties, stating, "That was our agreement as well as she would pay half of the house payment because she was the one that was insistent on buying a new house. I was perfectly happy where I was. But that was our agreement." When James was cross-examined by Sharon's lawyer about whether the agreement was put in writing, he stated, "No, we have put nothing in writing as a matter of fact. Any of the things you've talked about so far haven't been in writing. But that was our agreement also because she pressured so much to be there, and was so fanatic about it being her house." Sharon did not offer any rebuttal to James's testimony.

The trial court granted James's request to trace the $31,000 back to him, holding that the $31,000 would be offset by the

$4,000 Sharon received from the sale of her nonmarital home, and gave Sharon credit for the reduction of the principal owed on the home from the date of the final hearing until the house was sold. The remainder of any equity in the home was to be divided equally. Sharon appeals from this order.

██ The issue presented in this appeal deals with the division of property. In reviewing such cases, we affirm the findings of the chancery court unless they are clearly erroneous. *Dunavant v. Dunavant*, 66 Ark. App. 1, 986 S.W.2d 880 (1999), citing *Box v. Box*, 312 Ark. 550, 851 S.W.2d 437 (1993). Where matters of credibility are concerned, findings of those in a position to observe the witnesses (in this case, the chancellor), are given great weight. *Box v. Dudeck*, 265 Ark. 165, 578 S.W.2d 567 (1979). On appeal, we only reverse such a judgment if it is clearly against the preponderance of the evidence. *Digby v. Digby*, 263 Ark. 813, 567 S.W.2d 290 (1978).

██ ██ When property is placed in the names of a husband and wife, by an instrument running to them conjunctively, and without specification of the manner in which they take, a presumption arises that they own the property as tenants by the entirety. *Dunavant v. Dunavant, supra* (citing *Boggs v. Boggs*, 26 Ark. App. 188, 761 S.W.2d 956 (1988)). In *Lyle v. Lyle*, 15 Ark. App. 202, 691 S.W.2d 188 (1985), this court stated that when a husband and wife hold property as tenants by the entirety, there arises a presumption of a gift from the party furnishing the consideration. *Lyle* involved a husband and wife who made a down payment on forty acres and a house that was held as tenants by the entirety. In dividing the proceeds, the chancellor credited each party with the amount contributed toward the down payment on the forty acres. This court reversed and remanded, holding that although the contributions toward the down payment came from separate funds, the forty acres were held as tenants by the entirety, and, in such a situation, a presumption arises of a gift from the party furnishing the consideration.

██ Although this presumption is rebuttable, it is a strong one. In *Ramsey v. Ramsey*, 259 Ark. 16, 20, 531 S.W.2d 28, 31 (1975), the supreme court stated the following:

> The presumption is strong, and it can be overcome only by clear, positive, unequivocal, unmistakable, strong and convincing evidence, partially because the alternative is a resulting trust the estab-

lishment of which, under such circumstances, requires that degree of proof. (Citations omitted.)

In *McLain v. McLain*, 36 Ark. App. 197, 820 S.W.2d 295 (1991), this court held that the wife failed to overcome the presumption of a gift with regard to stocks, bonds, and securities purchased primarily with funds derived from her separate property, but held jointly, with her husband. The only evidence that the wife offered to rebut the presumption that she intended to make a gift was her testimony that she always thought of the stocks, bonds, and securities as being her property and that her husband was entitled to the income or what it could buy only as long as he was married to her.

■ We find the present case to be distinguishable from *Lyle, supra*, and *McLain, supra*. First, the assertion of an oral agreement is not analogous to the claim made by appellee in *McLain* that she did not "intend" to make a gift. Second, although the issue here is likewise whether the testimony presented by James is sufficient to rebut the presumption, Sharon testified only that the parties orally agreed to divide the mortgage payments, and that they owned the home jointly, in "equal names." To rebut the presumption, James testified that there was an additional aspect of the oral agreement providing for return of his nonmarital contributions when the home was sold. His testimony was also clear that the agreement was made to overcome his resistance to buying the new house. Sharon did not deny the existence of this aspect of the agreement; her statement that the home was in "equal names" is ambiguous at best and falls far short of a denial of the clear and specific testimony offered by James. Under these circumstances, we cannot say that the trial court was clearly erroneous in finding the testimony presented by James sufficient to overcome the presumption.

Affirmed.

PITTMAN, JENNINGS, and NEAL, JJ., agree.

BIRD and CRABTREE, JJ., dissent.

SAM BIRD, Judge, dissenting. The majority has affirmed the chancellor's divorce decree by which he enforced an alleged oral agreement for the unequal division of the proceeds from the sale of the parties' marital residence that they owned as

tenants by the entirety. Because I believe that the chancellor's decision is clearly erroneous, not supported by a preponderance of the evidence, and is a deviation from well-established case law, I respectfully dissent.

The majority acknowledges and cites cases that support the rule of property law, well established in Arkansas, that when a husband and wife acquire real property and title it in both of their names, a rebuttable presumption exists that the property is held by them as tenants by the entirety. *Dunavant v. Dunavant*, 66 Ark. App. 1, 986 S.W.2d 880 (1999), citing *Boggs v. Boggs*, 26 Ark. App. 188, 761 S.W.2d 956 (1988). Further, the majority cites several cases that are in accord with an equally well-established Arkansas rule of property law that when husband and wife hold real property as tenants by the entirety, a rebuttable presumption arises that the spouse furnishing the consideration has made a gift in favor of the other spouse, and that this presumption can only be overcome by clear and convincing evidence. *Ramsey v. Ramsey*, 259 Ark. 16, 531 S.W.2d 28 (1975); *McClain v. McClain*, 36 Ark. App. 197, 820 S.W.2d 295 (1991); *Lyle v. Lyle*, 15 Ark. App. 202, 691 S.W.2d 188 (1985). Both of these rules of law are involved in the case at bar because, from the record, it is undisputed that appellant and appellee were husband and wife who, during their marriage, acquired title to their marital residence in both of their names, and the husband furnished a greater portion of the consideration.

It is not disputed by the parties that they own their marital home as tenants by the entirety. Thus, the question in this case is whether the chancellor was clearly erroneous in his conclusion that clear and convincing evidence was produced that overcame the presumption of a gift. I believe that legal precedent compels the conclusion that the chancellor was clearly erroneous because, in my opinion, the evidence offered by appellee falls far short of being sufficiently clear and convincing to overcome the strong presumption of a gift that is applicable to this case.

At the trial, appellant testified that, "At the time Jim took the proceeds from the sale of his first house and put it in this house, there was no question that it was to be our house," that she and appellee "owned the house jointly in equal names and equal payments," and that "my contribution to the house would be half the

house payment, and from that point in time, I began making half the house payment."

Following appellant's testimony, appellee testified that when the marital residence was purchased, it was their agreement that "If the home was sold due to reasons or things like we're doing today, divorce, that the original equity would come back to me and we would split the difference," and that "[appellant] would pay half the house payment because she was the one that was insistent on buying a new house. That was our agreement. I want my original investment back."

The preceding two paragraphs constitute the sum and substance of the evidence that the majority judges apparently believe supports the chancellor's apparent conclusion[1] that *clear and convincing* evidence had been presented to rebut the *strong* presumption of a gift. Of course, appellant's testimony provides no evidence whatsoever that supports the chancellor's decision, so we are left only with appellee's statement that he would get his equity back "[i]f the home was sold due to reasons or things like we're doing today, divorce,...." If this testimony by appellee fulfills his obligation to produce *clear and convincing* evidence sufficient to overcome the *strong* presumption that a gift arises from the creation of a tenancy by the entirety, then the majority has given a new meaning to that phrase.

In explaining why their agreement was not in writing, appellee testified, "We have not put nothing in writing as a matter of fact. But that was our agreement also because she pressured so much to be there, and was so fanatic [sic] about it being her house." If, by this statement, appellee meant that they agreed that their agreement (that he would get his equity back in the event of "reasons or things" like divorce) would *not* be put in writing because appellant was fanatical about the house being hers, then the statement simply makes no sense. Why would appellant agree *not* to reduce their agreement to writing as a way of ensuring that she owned an equal interest in the house? This testimony by appellee is anything but clear and convincing.

---

[1] It does not appear expressly in the record on appeal that the chancellor acknowledged or applied the "clear-and-convincing-evidence" standard.

It seems to me that if, as appellee alleges, the parties had an agreement that was intended by them to rebut the law's strong presumption of a gift from the provider of the purchase price that arises from the creation of a tenancy by the entirety, appellee would have been the one insisting that it be put in writing, especially where one of the "reasons or things" that was to trigger the recoupment of his contribution included a divorce, not ordinarily a harmonious occasion. There was no evidence that corroborated the existence of an oral agreement between the parties that appellee would recoup his contribution to the purchase price upon the occurrence of "reasons or things" like divorce. To the contrary, all the evidence supports appellant's version of the agreement. It is undisputed that from the time they purchased the house until they separated, they each contributed half of each monthly house payment. This is what appellant said they agreed to do.

The most puzzling aspect of the majority opinion is that it bases its decision to affirm the chancellor on the fact that appellant did not offer rebuttal testimony to what the majority refers to as an "additional aspect of the oral agreement" that appellee would get his money back if "reasons or things like we're doing today" happened. I can not help but wonder what evidence she would offer in rebuttal that she had not already presented. She had already testified to the content of their agreement. Was not appellant's testimony that she and appellee owned the house "jointly, in equal names" clear enough to establish that she understood they each had an equal interest in the house? Was that testimony not sufficient to establish appellant's position that appellee had no greater interest in the house than she? Was appellee's ambiguous statement that "If the home was sold due to reasons or things like we're doing today ..." made clear and convincing because appellant did not take the stand and say, "Judge, we didn't agree to what he said"? Appellant's testimony had already made it abundantly clear that they agreed that they each owned an equal interest in the house. I do not see how appellant's failure to, again, take the stand and state the obvious can serve as a basis for the majority to conclude that appellee's different version of the agreement is clear and convincing.

I see no distinction between the case at bar and the *Lyle, supra,* and *McClain, supra,* cases cited by the majority. In *Lyle,* we reversed a chancellor who had ordered in a divorce decree that the proceeds from the sale of tenancy-by-the-entirety real property be first allo-

cated to the parties in the amounts that each had contributed toward the down payment, and that the balance be divided equally between them, exactly like the court ordered in the case at bar. In *McClain*, a chancellor found that certain personal property was not held by the parties as tenants by the entirety, and refused to distribute it between the parties. We reversed, holding that the property was tenancy-by-the-entirety property, and, as such, was required to be divided equally between the parties, absent clear and convincing evidence to the contrary. We said:

> Clear and convincing evidence is evidence by a credible witness whose memory of the facts about which he testifies is distinct, whose narration of the details is exact and in due order, and whose testimony is so direct, weighty, and convincing as to enable the fact finder to come to a clear conviction, without hesitation, of the truth of the facts related. (Citation omitted.)

*McClain*, 36 Ark. App. at 199, 820 S.W.2d at 296-97.

The majority attempts to distinguish *Lyle* and *McClain* by noting that those cases involved only proof that there was no intent to make a gift, whereas, in the case at bar, there is evidence of an agreement. This is simply not a valid distinction. In order to distinguish *Lyle* and *McClain* on that basis the majority has, first, concluded that appellee's version of the agreement was, in fact, the agreement of the parties, and, then, bootstrapped this conclusion to the level of clear and convincing evidence by the inconsequential fact that appellant did not offer rebuttal testimony.

I do not understand how the majority can acknowledge and quote from *Ramsey*, *supra*, that the strong presumption in the case at bar "can be overcome only by clear, positive, unequivocal, unmistakable, strong, and convincing evidence," and hold that appellee's testimony rises to the level necessary to rebut the presumption. To so hold renders the presumption meaningless and makes a mockery of the phrase "clear and convincing."

I also do not understand how the majority can conclude that appellant's testimony that she and appellee owned their marital residence "jointly" and "in equal names" is ambiguous, while holding that appellee's testimony that he would get his money back "if reasons or things like we're doing today" happened is clear and

convincing. Even if appellant's testimony is ambiguous, that fact lends neither clarity nor weight to appellee's testimony.

The majority opinion stands for the proposition that to overcome the presumption of a gift by the tenant providing the consideration for the purchase of tenancy-by-the-entirety property, the would-be benefactor need only testify, without any corroboration, that the tenants agreed otherwise. I suggest that this case marks the beginning of the end of that *strong* presumption.

I would reverse and remand this case for the chancellor to order that the proceeds from the sale of the marital residence be distributed equally between the parties. I am authorized to state that Judge CRABTREE joins in this dissent.